1  Stephen G. Larson (SBN 145225)
   *slarson@larsonllp.com*
2  R. C. Harlan (SBN 234279)
   *rharlan@larsonllp.com*
3  Troy S. Tessem (SBN 329967)
   *ttessem@larsonllp.com*
4  **LARSON LLP**
   555 South Flower Street, Suite 4400
5  Los Angeles, California 90071
   Telephone:(213) 436-4888
6  Facsimile: (213) 623-2000

7  Attorneys for Plaintiff
   PEPÉ'S INC., a California corporation
8  dba Pepé's Towing

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 11  PEPÉ'S, INC., a California corporation dba Pepé's Towing, | Case No. 5:21-cv-01646 |
| 12                    Plaintiff, | **COMPLAINT FOR CIVIL RIGHTS VIOLATIONS, CONSPIRACY TO DENY CIVIL RIGHTS, AND BREACH OF CALIFORNIA GOVERNMENT CODE § 1090** |
| 13            vs. | |
| 14  CITY OF SAN BERNARDINO, a charter city organized under the laws of the State of California; JOHN VALDIVIA, an individual; THEODORE SANCHEZ, an individual; SANDRA IBARRA, an individual; JUAN FIGUEROA, an individual; FRED SHORETT, an individual; BEN REYNOSO, an individual; KIMBERLY CALVIN, an individual; DAMON ALEXANDER, an individual; ROBERT D. FIELD, an individual; SONIA R. CARVALHO, an individual, ERIC MCBRIDE, an individual, and DOES 1 through 10, inclusive, | **DEMAND FOR JURY TRIAL** |
| 23                    Defendant. | |

1    Plaintiff, PEPÉ'S, INC., a California corporation dba Pepé's Towing Service

2  ("Pepé's"), by and through its undersigned counsel, sues Defendant the City of San

3  Bernardino, a charter city organized under the laws of the State of California

4  "Defendant"), and states as follows:

5                                    **INTRODUCTION**

6    1.    For over 20 years, the City of San Bernardino Tow Rotation has been

7  beset by illegal corruption and cronyism, resulting in the same tow companies being

8  awarded City contracts without competitive bidding between 1999 and 2020.

9  During that same time period, Pepé's attempted to apply to become part of the Tow

10 Rotation, but was denied access because the unequal enforcement of the Tow

11 Rotation's official requirements.  Finally, after being sued and settling a federal civil

12 rights lawsuit for $1.3 million, the City conducted an open and seemingly

13 competitive bidding process in January 2021.  Unfortunately, the same cronyism

14 and corruption has infected the Tow Rotation again, resulting in the same

15 unqualified Tow Companies being awarded City Contracts despite not meeting the

16 City's requirements.

17    2.    Accordingly, Pepé's once again brings an action to ensure equal

18 treatment in the City's Tow Rotation, including the equal enforcement of the City's

19 requirements, and to root out the cronyism and corruption that has infected the Tow

20 Rotation for over 20 years.

21                           **JURISDICTION AND VENUE**

22    3.    This action arises under the Fifth and Fourteenth Amendments of the

23 United States Constitution; Article 1, sections 2 and 7 of the California Constitution;

24 and federal statutes, including 42 U.S.C. §§ 1983, 1985, 1986, and 28 U.S.C. §

25 1331. Venue is proper because all the events and omissions giving rise to the claim

26 occurred in this District.

27    4.    Venue is proper in the Central District of California under 28 U.S.C. §

28 1391(b), because a substantial part of the acts and circumstances giving rise to this

LARSON LLP
LOS ANGELES

action occurred in this District, and all Defendants are subject to personal jurisdiction in this District.

## IDENTITY OF PARTIES

5.      Plaintiff Pepé's, Inc. dba Pepé's, Towing Service ("Pepé's") is a corporation organized and existing under the laws of the State of California, with its principal place of business in the State of California.  Pepé's, at all times relevant to the Complaint, was, and is, a towing business.  Pepé's location in the City of San Bernardino is located at 1303 E. Victoria Avenue, San Bernardino, California 92408.  Plaintiff is a taxpayer in the City of San Bernardino

6.      Defendant City of San Bernardino ("City") is, and at all relevant times was, a municipal corporation, a charter city in San Bernardino County, California, organized under and existing by virtue of the laws of the State of California.  The City is governed by a City Council with seven members and a Mayor.  The City Council is referred to as the City Council in the operative charter, but as the Common Council in many municipal ordinances.  It will be referred to as "City Council" throughout this Complaint.  The City Council Members and Mayor are City employees who are individual Defendants.  At all relevant times, the City Council has been the legislative body that governs the City.

7.  Defendant Theodore Sanchez is a current City Council Member and, on information and belief, is a citizen of California.  He has been a City Council Member since November 2018.

8.      Defendant Sandra Ibarra is a current City Council Member and, on information and belief, is a citizen of California.  She has been a City Council Member since November 2018.

9.      Defendant Juan Figueroa is a current City Council Member and, on information and belief, is a citizen of California.  He has been a City Council Member since May 2019.

10.      Defendant Fred Shorett is a current City Council Member and, on

information and belief, is a citizen of California.  He has been a City Council Member since March 2009.

11.    Defendant Ben Reynoso is a current City Council Member and, on information and belief, is a citizen of California.  He has been a City Council Member since December 2020.

12.    Defendant Kimberly Calvin is a current City Council Member and, on information and belief, is a citizen of California.  He has been a City Council Member since December 2020.

13.    Defendant Damon Alexander is a current City Council Member and, on information and belief, is a citizen of California.  He has been a City Council Member since December 2020

14.    Defendants Sanchez, Ibarra, Figueroa, Shorett, Reynoso, Calvin, and Alexander were all City Council Members in 2021 when the Council approved Resolution 2021-63—the resolution central to Plaintiff's claims.  As City Council Members, they were the officials responsible for legislating and setting the policies of the City of San Bernardino. The City Council Member Defendants named above at all relevant times authorized, and/or ratified the actions of the other City employees, agents, and officials as alleged herein.

15.    Defendant John Valdivia is the current Mayor of the City and, on information and belief, is a citizen of California.  He has been Mayor since December 2018.  As the Mayor of the City of San Bernardino, Mayer Valdivia was the official responsible for setting and enforcing the policies, customs, and practices of the executive departments of the City in enforcing the laws and carrying out the directions of the City Council.  Mayor Valdivia at all relevant times directed, supervised, authorized, and/or ratified the actions of the City's executive employees, agents, and officials as alleged herein.

16.    Defendant Robert D. Field is the current City Manager for the City of San Bernardino and, on information and belief, is a citizen of California. He has

been the City Manager since September of 2020. As the City Manager, Robert Field was the official responsible for setting and enforcing the policies, customs, and practices of the City Manager's Office in running the City and carrying out the directions of the City Council.  Robert Field directed, supervised, authorized, and/or ratified the actions of the City Manager's employees, agents, and officials and other City employees, agents, and officials, as alleged herein.

17.     Defendant Sonia R. Carvalho is the current City Attorney for the City of San Bernardino and, on information and belief, is a citizen of California. On information and belief, Defendant Carvalho has been the City Attorney since August of 2018.  At all relevant times Sonia Carvalho was the official responsible for setting and enforcing the policies, customs, and practices of the City Attorney's Office in enforcing the laws and carrying out the directions of the City Manager and City Council.  Sonia Carvalho at all relevant times directed, supervised, authorized, and/or ratified the actions of the City Attorney's Office's employees, agents, and officials as alleged herein.

18.     Defendant Eric McBride was the acting Chief of Police for the City from January 2019 until he retired on August 31, 2021, and, on information and belief, is a citizen of California. As the acting Chief of the City of San Bernardino Police Department, Chief McBride was the official responsible for setting and enforcing the policies, customs, and practices of the Police Department in enforcing the laws and carrying out the directions of the City Manager and City Council. Chief McBride at all relevant times directed, supervised, authorized, and/or ratified the actions of the Police Department's employees, agents, and officials as alleged herein.

19.  Doe Defendants 1-10 are sued under fictitious names, as Plaintiff is ignorant of the true names of the Doe Defendants. Once the identity of these parties has been established, Plaintiff will substitute the Doe Defendants' true names. All the Doe Defendants are past or present employees of the City. Plaintiff believes it

will be able to identify the Doe Defendants through discovery of City documents and through depositions revealing the involvement of specific Police Department, City Attorney's Office, and City Manager's Office City employees who were actors involved in the misconduct alleged.

## FACTUAL BACKGROUND

20.    Plaintiff Pepé's, Inc. dba Pepé's, Towing Service ("Pepé's") at all times relevant to the Complaint, was, and is, a towing business.  Pepé's has been in business for over 40 years, operating over 85 heavy, medium, and light duty trucks. Pepé's tow trucks include super heavy-duty trucks that can tow 18-wheeler tractor-trailer rigs as well as trucks that can recover vehicles in a variety of challenging situations, and an extensive range of medium and light-duty tow trucks.

21.    Manuel Acosta is part-owner and president of Pepé's.  His parents, Jose and Delfina Acosta, established Pepé's in October of 1978.  Manuel joined the business in March of 1987.

22.    Pepé's has a long history of service throughout San Bernardino County, and serves the Fontana and Central stations of the San Bernardino County Sheriff's Department, as well as the cities of Highland, Loma Linda, Yucaipa, Grand Terrace, and Chino Hills.  Pepé's also serves the California Highway Patrol in the Inland Empire, as well as many other police departments throughout the area.  Throughout its history, Pepé's has prided itself on excellent service, fair prices, and transparent relationships with the government agencies with which it contracts.  Indeed, Pepé's facilities and services are highly regarded.

23.    Pepé's location in the City of San Bernardino was opened in 2000.  The San Bernardino location has a large indoor storage facility in addition to a fully paved outside yard with a storage capacity of over 300 vehicles, all fully secured with a continuously operating security system and bright security lighting.

24.    As soon as Pepé's started operating its yard at 1303 East Victoria Avenue in the City of San Bernardino in 2000, Manuel Acosta immediately inquired

with the City regarding the possibility of contracting with the City and joining the City's Tow Rotation.  Although the City often contacted Pepé's and asked it to handle complex and heavy-duty tows and operations that tow carriers contracted with the City were not able to handle because they lacked the heavy-duty equipment and expertise, the City, discussed *infra*, never included Pepé's on the Tow Rotation.

### **The City Towers' Monopolization of the City's Tow Rotation**

25.    The City's tow services agreements are governed by resolutions adopted by the City Council setting forth the number of private tow companies that will be granted contracts, the requirements that will be imposed by the contracts, the procedure for award of contracts, and other terms and conditions.

26.    In 1995, the City adopted Resolution 95-241, which established the City's Tow Rotation system for the performance of towing services in response to calls from the City.

27.    Effective July 10, 1995, Resolution 95-241 required all companies providing tow services for the City to enter into a non-exclusive franchise agreement with the City wherein each tow carrier was required, *inter alia*, to maintain outside storage space for at least 200 vehicles, to provide a certain amount of inside vehicle storage, and to install and maintain security lighting and perimeter security to protect the towed vehicles and their contents from vandalism and theft.  Pursuant to Resolution 95-241, the City entered into tow service agreements with five tow companies, including, among others, Tri-City Towing, Inc. ("Tri-City Towing"), Al Wilson Services, Inc., later merged into Wilson Towing LLC ("Wilson Towing"), City Towing, and Big Z Towing, Inc. ("Big Z Towing"),which was later acquired by Armada Towing.

28. In 1999, the City renewed contracts with the four tow carriers mentioned above and also added Danny's 24 Hour Towing ("Danny's Towing").

29.    In 2005, the City adopted Resolution No. 2005-286, which set forth different requirements for existing Tow Rotation contractors and new potential Tow

Rotation contractors.  For existing rotation tow contractors, like the City Towers, Resolution No. 2005-286 required storage space sufficient for 200 vehicles but did not set forth a specific square footage requirement.  New Tow Rotation contractors, on the other hand, were required to have sufficient storage space for 200 vehicles and a minimum outside storage yard 65,000 square feet in size.  The addition of the 65,000 square foot requirement, applying only to candidates seeking to join the Tow Rotation, was to prevent new candidates from qualifying, should there ever be an open spot in the rotation, either by attrition or by a decision to add an additional tow company to the rotation.

30.     Under Resolution No. 2005-286, the City granted the City Towers a "grandfather" exception to the new tow contractor requirements, which meant that the City Towers did not need to meet the 65,000 square foot requirement.  In effect, the "grandfather" exception furthered the City Towers' monopolization of the City's Tow Rotation as the City Towers were not required to satisfy the more stringent requirements, while Pepé's and any other tow companies not part of the chosen inner circle faced greater barriers to entry to enter into tow service agreements with the City.

31.  At the same time, the City renewed its tow service agreements with Tri-City Towing, Wilson Towing, City Towing, Big Z Towing (later Armada Towing), Danny's Towing, and added a sixth tower, Michael Hayes Towing, LLC ("Hayes Towing"), to the City's Tow Rotation (collectively the "City Towers").

32. On April 19, 2011, the City Council approved Resolution No. 2011-91 which amended Resolution No. 2005-286.  Among other items, Resolution No. 2011-91 deleted the "grandfather" exception set forth in Resolution No. 2005-286. Accordingly, City Towers sold thereafter would be required to meet the 65,000 ft.$^2$ requirement.  However, in order to protect the City Towers and their owners, on May 7, 2012, the Mayor and City Council adopted Resolution No. 2012-72 approving the sale of Wilson Towing and kept it on the City's Tow Rotation, even

though it did not meet the 65,000 ft.$^2$ requirement.

33. Thereafter and between 2005 and 2016, the City simply renewed the existing Tow Services Agreements with the same City Towers, without any open or competitive bidding process.

34. In 2016, as the expiration date of the City's then tow service agreements approached, the City Council's Ways and Means Committee met on March 9, 2016 to discuss what to do when the contracts expired. At the meeting, then-City Manager Mark Scott recommended that the City Council extend the existing contracts for no more than one year on a month-to-month basis to provide basic fairness to all tow contractors in the process, to give the City an opportunity to provide notice of a planned bidding process for towing vendors, and to explore the cost/benefit of the City operating its own tow yard.

35. The plan for a month-to-month agreement and a planned bidding process for towing vendors alarmed the City Towers, who knew that they had long been out of compliance with the terms of their Towing Services Agreements in many material respects. Therefore, the City Towers knew that if the City opened bidding for their contracts, the City Towers would not be able to meet the minimum bid requirements because the City had allowed them to hold their lucrative tow services agreements without competition since at least 1995.

36. Between the March 9, 2016 meeting of the Ways and Means Committee and the April 4, 2016 City Council meeting, the City Towers conspired together to influence the City Council to ignore the recommendation of the Ways and Means Committee and the City Manager for a proposed month-to-month agreement. To maintain their monopoly of the City's Tow Rotation, the City Towers urged the City to enter into another five-year agreement with the City Towers without the planned bidding provision. Avoiding the bidding process was imperative for the City Towers as none of them were in full compliance with the City's tow service requirements set forth in the resolutions. Through this five-year

extension, rather than a month-to-month or one-year contract to be followed by an open, fair competition, the City avoided the public scrutiny that would force it to admit that the City for nearly 20 years had allowed the City Towers to monopolize the City's Tow Rotation through backroom dealing and bribery.

37.     On March 31, 2016, the City Towers contributed $12,450 to then-City Council Member Valdivia, just 4 days before he voted to extend their tow contracts for another 5 years.

38.     Instead of opening up the Tow Rotation to competition for new tow carriers based on fairness, merit, and qualifications, the City Council passed Resolution No. 2016-73, extending the City Towers' monopoly of the City's Tow Rotation and extending their tow services agreements for another five years without competitive bidding or any other opportunity for the consideration of any towing contractors other than the City Towers.

39.     After voting to adopt Resolution No. 2016-73, Defendant Valdivia received $4,825 in campaign contributions from City Towers between June 2016 and October 2016.  Specifically, Defendant Valdivia received $1,725 from City Towing, $1,350 from Danny's Towing, $1,250 from Tri-City Towing, and $500 from Wilson Towing.

40.     Council Member Fred Shorett, who voted to pass Resolution no. 2016-73 on April 4, 2016, received a contribution of $2,500 on April 20, 2016 from Jason Desjardins, former owner of Big Z Towing, which was later purchased by Armada Towing in 2017.

41.     The following year, Defendant Valdivia received $5,349 in campaign contributions from City Towers to his city council campaign.  Notably, Wilson Towing, Armada Towing, Danny's Towing, Hayes Towing, and the former owner of Big Z Towing (Jason Desjardins) contributed $1,000 each during the last two weeks of June 2017. Defendant Valdivia's mayoral campaign received an additional $4,500 from City Towers Wilson Towing ($2,500), Armada Towing ($1,500) and

1    Hayes Towing ($500) in the latter half of 2017.

2    **The City Rejects Pepé's Bid for a Position on the City's Tow Rotation**

3    **Thereby Furthering the City Towers' Monopoly**

4         42.    In response to the City's decision to renew the tow services agreement

5    with the City Towers an additional five years, Pepé's began to draw attention to the

6    City's blatant favoritism and to put pressure on the City to open the Tow Rotation to

7    competitive bidding.  As a result, on March 7, 2018, the City Council adopted

8    Resolution No. 2018-65 authorizing the addition of a new tow contractor to the

9    contract Tow Rotation.  Pursuant thereto, on March 13, 2018, the City issued RFP

10   F-18-06, inviting bids for a seventh tow company to join the Tow Rotation List.

11   Pepé's submitted a bid in response to RFP F-18-06.

12        43.    On March 8 and March 12, 2018, just days prior to issuing RFP F-18-

13   06, the City's Police Department sent letters to many of the City Towers identifying

14   violations in their compliance with the City's tow services agreement.  Below is a

15   list of the violations the City discovered for several of the City Towers:

16   •    Armada Towing: deficient parking surface.

17

18   •    City Towing: (1) deficient parking surface; (2) inadequate lighting

19        coverage; (3) deficient fencing; and (4) lack of security.

20   •    Danny's Towing: (1) deficient parking surface; and (2) inadequate

21        lighting.

22

23   •    Hayes Towing: (1) deficient parking surface; and (2) inadequate

24        lighting.

25   •    Wilson Towing: (1) deficient parking surface; and (2) inadequate

26        lighting.

27

28        44.    The letters required the City Towers to cure those deficiencies in order

to maintain their contracts.  However, the City Towers never cured their deficiencies, yet still remained on the City's Tow Rotation.

45.     On April 17, 2018, the City informed Pepé's that its application to be added to the City's towing rotation list was rejected because its "Minimum outdoor storage is less than the required 65,000 feet."  The City thereafter denied Pepé's appeal of the City's rejection on August 1, 2018.

46.     Notably, the City's rejection of Pepé's application came after the City Towers contributed $12,450 to Defendant Valdivia on March 31, 2016.

47.     Defendant Valdivia also received $17,074 from City Towers between April 1, 2016 and August 1, 2018, when he voted to deny Pepé's appeal. Defendant Fred Shorett received a total of $3,500 in campaign contributions from Wilson Towing, Hayes Towing, and Danny's Towing in the months after he voted to reject Pepé's application and appeal.

48.     Furthermore, after the City rejected Pepé's appeal, Defendant Valdivia received $13,350 from City Towers Armada Towing, City Towing, Danny's Towing, and Hayes Towing in campaign contributions from August 8, 2018 until January 29, 2019.

49.  What is more, Don Smith, who at the time was a legislative field representative for Mayor Valdivia, testified that in October of 2018—after the City rejected Pepé's application and appeal—he witnessed Danny Alcarez, owner of Danny's Towing, hand an envelope of additional money to Mayor Valdivia at a secret meeting at a restaurant at 1 a.m. in the morning.  According to Smith, Alcarez told Valdivia that the money was to thank him for his support of the City Towers.

50.     At the same time, the City Towers had not only failed to cure their deficiencies, but also all but one did not meet the 65,000-square-foot outside storage requirement.

**Pepé's Brings a Lawsuit Against the City**

51.     Following the City's decision to affirm the rejection of Pepé's

LARSON LLP
LOS ANGELES

application, Pepé's, on October 24, 2018, filed a federal lawsuit against the City and various individuals, alleging that the City had treated Pepé's differently than all of the other City Towers and deprived Pepé's of its constitutional right to equal treatment under the law.

52.     On September 15, 2020, Pepé's and the City entered into a Settlement Agreement to resolve the federal lawsuit.  None of the claims alleged herein were released under the terms of the Settlement Agreement, as the present claims center on the award of the recent Tow Services Agreement at the March 17, 2021 City Council meeting.

### The City Issues RFP F-21-16 Following the Settlement Agreement

53.     Following the settlement, the City stated it would engage in an open bidding process and issued RFP F-21-16 (and Addendum) soliciting bids for the next Tow Rotation contract.  The City indicated it would include members of the Tow industry in this process to ensure that the City's Tow Rotation included best practices in the industry.

54.     While it initially appeared that the City was mending its ways by finally abiding by its obligations to its citizens and taxpayers by engaging in a fair and open bidding process for the first time in over 20 years, this did not end up being the case.  To the contrary, even after paying Pepé's $1.3 million to settle Pepé's first lawsuit, the City did not include anyone from the tow industry in developing the new RFP, and continues to favor the City Towers and treat Pepé's differently than the City Towers in violation of Pepé's constitutional rights to equal protection.

55.     On December 23, 2020, the City requested bids from tow carriers through RFP F-21-16.

56.  In response, five of the six City Towers (i.e., Armada Towing, Danny's Towing, City Towing, Hayes Towing and Wilson's Towing) sent a letter to the City complaining about the RFP's requirements—which were supposedly in effect

during the previous contractual period, effectively admitting they were not and had not been in compliance.

57.     Pepé's responded on January 8, 2021 to these City Towers' blatant attempt to persuade the City to not enforce the new requirements by writing its own letter to the City describing the irony of the request.

58.     The five City Towers complained that meeting the City's requirements would cost millions of dollars to acquire the required equipment and complained that there was insufficient time to meet the paved lot requirement by July 1, 2021. In addition, the five City Towers complained about the 31,500 ft.$^2$ and 175 vehicle storage requirement.

59. Yet, the City has had a 175 (or higher) vehicle storage requirement since 1999.  The five City Towers complained about the 31,500 ft.$^2$ storage requirement, but did not complain when the City enforced a 65,000 ft.$^2$ against new applicants beginning in 2011.  In reality, the 2021 tow services agreement requires less of the City Towers, and yet they cried foul, even though according to the City's and City Towers' prior representations, the five City Towers had been compliant with many of these requirements over the last ten years.

60.     The five City Towers' complaint about meeting the pavement requirement by July 1, 2021 is even more troubling given the fact that in March of 2018, all five (Armada Towing, City Towing, Danny's Towing, Hayes Towing, and Wilson Towing) received letters from the City telling them that they were in violation of the paved surface requirement and were required to cure the deficiency within 90 days of receiving the letter.

61.     Notwithstanding the City Towers' complaints in their January 8, 2021 letter, all but one applied for a 2021 tow services agreement with the City.  After receiving the City's RFP, City Towing decided not to apply, no doubt because it could not meet the City's requirements.

62. The City received bids from ten firms in response to RFP F-21-16.

Among those, five of the six original City Towers applied for tow services agreements with the City including Armada Towing, Danny's Towing, Hayes Towing, Tri City Towing, and Wilson Towing (collectively "2021 City Towers").

63.     On March 17, 2021, Interim Chief of Police Eric McBride and City Manager Robert D. Field recommended in their staff report to the Mayor and the City Council to adopt Resolution No. 2021-63 and authorize the City Manager to execute tow services agreements with various tow service carriers including Pepé's.

64.     In the staff report, the City organized the tow carrier applicants into five different categories.  Category 1 contained tow carriers that met all City requirements and which the City staff recommended should receive a contract and be included in the City's Tow Rotation beginning April 1, 2021.  The City placed A&G Towing in Category 1.  Category 2 contained tow carriers that indicated they were able to meet most of the City's requirements, but not all. Notwithstanding, Category 2 contained tow carriers that the City had no reason to believe would not be able to meet all the requirements by April 1, 2021.  Accordingly, staff required affirmative confirmation from the tow carriers in Category 2 that they had the ability to meet all the requirements, and recommended that Category 2 tow carriers receive a contract and be included in the City's Tow Rotation effective April 1, 2021. Hayes Towing, Statewide Towing, Tri City Towing, and Pepé's Towing were placed in Category 2.

65.  The City placed Hayes Towing in Category 2 because it did not meet the requirement for the specific number and types of tow vehicles in its inventory. Statewide Towing was placed in Category 2 because it did not meet several requirements, including, but not limited to, appropriate signage, location of the business office within the City, sufficient lot lighting, noncompliance with City lot enclosure regulations, failure to adhere to storm water regulations, and a minimum of 31,500 square feet of pave surface. Tri City Towing was placed in Category 2 because it did not have the specific number and types of tow vehicles in its

inventory.

66. On the other hand, Pepé's was placed in Category 2 on the basis that it did not adhere to storm water regulations or have a minimum of 31,500 square feet of paved surface.  Both assessments were incorrect, and Pepé's application stated affirmatively that it met both of those requirements.  In reality, Pepé's should have been placed in Category 1.

67. Category 3 contained tow carriers that requested a variance under Resolution No. 2020-306 for additional time to meet certain requirements by July 1, 2021.  Here, the City staff recommended that these tow carriers receive a contract, but remain off the City's Tow Rotation until the requirements were met, no later than July 1, 2021.  Armada Towing and Wilson Towing were placed in Category 3. Armada Towing did not meet the storm water regulations and did not meet the requirement for 31,500 square feet of paved surface.  Wilson Towing did not satisfy the same requirements as Armada Towing, and also did not have the correct number and types of tow vehicles in its inventory.  Tellingly, both Armada and Wilson Towing were City Towers during the previous Tow Rotation, which required them to have more than the current 31,500 square foot requirement of paved surface. Indeed, both had been told in March of 2018 that they were in violation of the City's pave surfaces requirement.  Furthermore, previous tow services agreements required the 2021 City Towers to comply with Federal and State laws or regulations which would include California's storm water regulations.  Plus, the 2011 Tow Services Agreements required the 2021 City Towers to have the necessary equipment to tow Class B and Class C vehicles, yet four of the 2021 City Towers complain that they will have to expend millions of dollars to comply.

68.  Category 4 contained tow carriers that both requested a variance until July 1, 2021 and indicated that they could meet most requirements, but not all.  For Category 4 tow carriers, staff recommended that they receive a contract provided that they confirm in writing their ability to meet all the requirements, but not be

placed on the Tow Rotation until all requirements were met, not later than July 1, 2021.  The City placed Danny's Towing into Category 4 for a host of reasons, including inability to respond to service request within 30 minutes, failure to dispatch appropriate equipment to a service call, responding only to calls for service for which the tow operator was summoned, insufficient storage capacity and yard size, insufficient pave surface, nonadherence to storm water regulations, insufficient enclosed storage space, and many others.  Many of these same requirements were required under previous tow services agreements.

69.  Category 5 contained tow carriers who indicated an inability or unwillingness to meet the tow requirement, and were not recommended to receive a contract (two tow carriers).

70.  Based on these categories, and without any prior inspection to independently determine if any of the applicants actually met the requirements, the staff report recommended that the tow carriers in Categories 1 through 4 be awarded tow contracts with the City, but that the tow carriers in Categories 3 and 4 not be placed on the Tow Rotation until they had met all requirements.  The staff further recommended that the tow carriers in Categories 3 and 4 must meet the requirements no later than July 1, 2021.

71.  None of the 2021 City Towers were listed in Category 1.  Rather, Tri City Towing and Hayes Towing were listed in Category 2, and Armada Towing and Wilson Towing were listed in Category 3.  Danny's Towing was listed in Category 4.  Furthermore, the City incorrectly categorized Pepé's as Category 2 instead of Category 1, even though Pepé's indicated in its application that it met all requirements, including the 31,500 square-foot paved surface requirement and storm water regulations.

72.  There is no justifiable excuse for the 2021 City Towers to be out of compliance with the City's tow service agreement requirements.  On March 8 and March 12, 2018, during the previous term of the Tow Rotation, the City's Police

Department sent cure letters to Armada Towing, Hayes Towing, Danny's Towing, and Wilson Towing because their lots did not meet the City's parking surface/pavement requirements.  These tow companies were required to come into compliance with the last tow contract three years ago, but never did.  Instead, they ignored the cure letters, and continued to operate as a City Tower without any repercussions.

### The City Continues to Engage in Blatant Favoritism

73.     During the City Council's March 17, 2021 hearing to consider this matter, the City Council went even further than the City Staff recommendation.  The City Council motioned and voted that all tow carriers in Categories 1 through 4 would be awarded a tow contract *and* be placed on the City's Tow Rotation effective April 1, 2021.

74.     Illogically, and in contravention of the established practice of the City's Police Department, the City indicated that it would not perform inspections prior to awarding the tow contracts.  Only *after the tow contracts had been awarded* would the City inspect and, if any contracted tow carrier did not meet all tow requirements, suspend or remove the tow carrier from the City's Tow Rotation.

75.     This is in direct contradiction to how the City handled Pepé's in 2018, when it inspected Pepé's before it denied its application to join the City's Tow Rotation.

76.     As a result of the City Council's March 17, 2021 decision, regardless of whether a tow carrier actually meets the City's requirements, the tow carriers, including the 2021 City Towers, were awarded a tow contract and placed on the City's Tow Rotation without inspection.  The City Council further rejected Staff's written recommendation that those tow carriers in Categories 3 through 4 not be placed on the Tow Rotation until they had shown they could meet the contract requirements.  Instead, those towers were allowed to be placed on the Tow Rotation immediately.

77.     What is more, the July 1, 2021 deadline has now since passed, but the City has taken no actions to ensure that the 2021 City Towers meet the Tow Rotation requirements.  Despite continued violations of the Tow Rotation requirements, the City has failed to take any action to remove the 2021 City Towers who have not satisfied the terms of their contract with the City.  Plaintiff addressed this in letters to the City on January 19, 2021, March 22, 2021 June 16, 2021, and August 6, 2021 without recourse or response.  The City has failed to even acknowledge Plaintiff's letters drawing attention to the City's blatant double standards.  Plaintiff's owner, Manny Acosta, has even physically attended City Council meetings to raise these issues with the City, but has been repeatedly ignored.

78.     To shore up its ability to ignore its own requirements, the new tow service agreement gives the City total and complete discretion in determining when to suspend or terminate a tow carrier, thus insuring that the City is not required to take any action against a non-compliant 2021 City Tower.  These facts have created an untenable situation and establish that the City is still committed to propping up its old boys' club.  In contravention of the staff recommendation, the City awarded tow service agreements to the 2021 City Towers and placed them on the Tow Rotation even though they do not meet the requirements and even though they have not been inspected. And now, the City has secured itself sole discretion on whether to remove a tow carrier, thereby ensuring that it can keep the 2021 City Towers on the Tow Rotation until the next RFP.

**City Officials Engage in a Pay-To-Play Scheme, Establishing that City Officials Receive an Indirect Financial Benefit From its Contracts with the City Towers**

79.     The City's position reveals that it is engaged in a pay-to-play scheme with the City Towers.  At the outset, the City's purpose is to ensure an "efficient and safe procurement" of towing services "while also protecting the public health,

safety, and welfare." Assuming these are the same goals that required the City to deny Pepé's Towing a tow contract over the past 20 years because it did not meet the storage requirements of those previous tow contracts, it is expected the City would continue to enforce the requirements in the City's new RFP for the same reasons. But not surprisingly, in order to ensure that the City Towers were awarded contracts, the City is now ignoring its own requirements and awarding contracts despite an admitted lack of qualification.

80.    Given that the City Towers have been on notice for three years to fix these issues and have not done so, the City's decision to award them new tow contracts and place them on the City's Tow Rotation evidences the City's continued ratification of the old boys' club.

81.    In the past, when Pepé's attempted to apply for a Tow Rotation contract, the City Council went so far as to increase the requirements to be on the Tow Rotation by requiring 65,000 square feet of outdoor vehicle storage, and the ability to store 200 vehicles, knowing that no new tow applicants within the City could meet those requirements. Of course, most of the existing City Towers could not meet it either, but the City Council conveniently grandfathered them into the previous requirements, ensuring that the monopoly would continue.

82.    For over 20 years, the City Towers enjoyed a monopoly on the city Tow Rotation because their initial city tow contracts were simply renewed by the City Council, without any competitive bidding process. It is obvious that the City awarded the City Towers these contracts based solely on monetary donations (of which only the reported political contributions are now known), which is illegal and subject to both federal and state criminal investigation and prosecution.

83.    As previously addressed, on March 31, 2016, the City Towers contributed $12,450 to then-City Councilman Valdivia, just 4 days before he voted to extend their tow contracts for another 5 years. In total, between 2014 and 2017, Defendant Valdivia received $25,374 in campaign contributions from City Towers

for his city council member campaign.  Between 2017 and the present, Defendant Valdivia also received $43,750 in campaign contributions from City Towers for his mayoral campaign.  $10,000 of that amount was given to Defendant Valdivia on December 23, 2019 when Danny's Towing, Armada Transport, Wilson Towing, City Towing, and Hayes Towing each contributed $2,000 on the same day.  What is more, Defendant Valdivia received $13,500 of the $43,750 from the owner of Armada Towing Michael Armada ($5,000), Danny's Towing ($2,000), Wilson Towing ($5,000), and Hayes Towing ($1,500) all in the four months prior to the City issuing the new 2021 RFP.

84.     Additionally, Don Smith, who at the time was a legislative field representative for Mayor Valdivia, testified that in October of 2018, he witnessed Danny Alcarez, owner of Danny's Towing hand an envelope of money to Mayor Valdivia at a secret meeting at a restaurant at 1 a.m. in the morning.  According to Smith, Alcarez told Valdivia that the money was to thank him for his support of the City Towers.

85.     Recent campaign contributions during the last election cycle before the City revised its RFP process have exhibited the same pattern.  Sandra Ibarra received $250 from Danny's Towing and $250 from Hayes Towing right before she was elected to office in 2018.

86. During 2019, Juan Figueroa received $1,250 from Michael Armada, the owner of Armada Towing, $250 from Armada Transport, an affiliate of Armada Towing, $250 from Danny's Towing, $250 from Hayes Towing, and $500 from Wilson Towing.  In total, Figueroa received $2,500 from the 2021 City Towers. Noticeably, donations from Michael Armada, Danny's Towing, Hayes Towing all occurred on the same date: January 15, 2019. Mr. Figueroa also received $6,000 in contributions from Mayor Valdivia's own campaign between 2019 and the present.

87. In 2016, Council Member Fred Shorett received $2,500 from Desjardins, the owner of Big Z Towing and who had also served as Council Member in 2011

while his company held a tow contract with the City.  In 2018, Shorett received $250 from Danny's Towing, $750 from Hayes Towing  and $2,500 from Wilson Towing.  In 2020, Shorett received $250 from Armada Transport, $250, from Danny's Towing, $250 from Hayes Towing, and $250 from Wilson Towing. Noticeably, Shorett's 2020 contributions from the 2021 City Towers all occurred on the same day: January 6, 2020.  In total, Defendant Shorett has received $7,000 in campaign contributions from the 2021 City Towers.

88. Council Member Theodore Sanchez has also received significant support from the 2021 City Towers.  Prior to being elected in November 2018, Sanchez received $750 from Hayes Towing, $1,000 from Michael Armada, and $200 from Danny's Towing.  Defendant Sanchez also received nonmonetary contributions from Wilson Towing to the value of $777.98.  The contributions did not stop when Defendant Sanchez was elected.  After his election, Defendant Sanchez received $2,900 from Wilson Towing with the latest contribution of $1,000 arriving on June 16, 2021—after he voted to grant tow services agreements to the noncompliant 2021 City Towers. He also received $200 from Michael Armada, $400 from Hayes Towing, $1,750 from Armada Towing, and $500 from Danny's Towing. Here too, there is conformity in when the City Towers made their contributions showing coordination.  Hayes Towing, Wilson Towing, Armada Towing all made contributions on the same day: September 22, 2020.  And Armada Towing and Wilson Towing made identical contributions of $1,000 on June 16, 2021. In total, Defendant Sanchez has received nearly $8,500 in campaign contributions from the 2021 City Towers.

89.     Despite the City's representations that it would engage in a fair process, it appears that the City is going about business as usual and continuing to show blatant favoritism, in what has become an all too familiar pay-to-play scheme. Continuing to reward the 2021 City Towers—who enjoyed an illegal 20-year monopoly—despite not meeting the City's requirements simply because they are

large campaign donors to the Mayor and other City Council Members is illegal.  In addition, the City's continued differential treatment of Pepé's violates Pepé's equal protection rights.  Pepé's therefore brings this lawsuit as the City's illegal and discriminatory conduct can no longer be tolerated.

### FIRST CLAIM FOR RELIEF

**Violation of Equal Protection under Fourteenth Amendment, U.S. Constitution; 42 U.S.C. § 1983; and Article 1, § 7, California Constitution**

**Against All Defendants in their Official and Individual Capacities**

90.    Plaintiff incorporates paragraphs 1–89 by reference as if fully set forth herein.

91.    Defendants' decision to award tow contracts to the 2021 City Towers despite their inability to satisfy the City's tow service requirements was an action in which Defendants intentionally and without rational basis, treated Pepé's differently from others similarly situated, the 2021 City Towers.

92.    At all times, Pepé's had a right to have its application weighed fairly, on equal terms with existing rotation tow contractors, and without inclusion of requirements that had no rational basis and did not apply equally to existing rotation tow contractors and new candidates to join the rotation.

93.    When Pepé's previously attempted to apply for a Tow Rotation contract, Defendants went so far as to change the requirements to be on the Tow Rotation by requiring 65,000 square feet of vehicle storage, and the ability to store 200 vehicles, knowing that no new tow applicants within the City could meet those requirements.  By contrast, when the 2021 City Towers applied for a Tow Rotation contract pursuant to RFP F 21-16, the City granted tow contracts to the 2021 City Towers even though the 2021 City Towers were not in compliance with the City's tow requirements—and admitted they were not in compliance with previous tow requirements.

94.    Defendants purportedly acted under color of law pursuant to the City of

San Bernardino Municipal Code and the City of San Bernardino Charter, Resolution Nos. No. 2021-63, 2018-65, 2016-73, 2011-91, 2011-80, and 2005-286, as well as other City Council Resolutions and the contracts based on those Resolutions.

95.     Defendants Mayor Valdivia and Council Members Sanchez, Ibarra, Figueroa, Shorett, Calvin, and Alexander—in their official and individual capacities—violated Plaintiff's constitutional rights by voting to award the 2021 City Towers tow services agreements even though they were not fully compliant with City requirements.

96.     Thereafter, all Individual Defendants—in their official and individual capacities—violated Plaintiff's constitutional rights by failing to enforce the requirements of the tow services agreements against the noncompliant 2021 City Towers.

97.     Defendants' actions intentionally violated clearly established constitutional rights of which a reasonable person would have known.

98.     As a result of Defendants' actions, Plaintiff suffered monetary damages, loss of business, loss of employment, and additional damage according to proof.

99.     Defendants' actions were motivated by evil motive or intent, and/or involved reckless or callous indifference to Plaintiff's federally protected rights.

**SECOND CLAIM FOR RELIEF**

***Monell* Liability – Final Policymaker (42 U.S.C. § 1983)**

**Against All Defendants in Their Official and Individual Capacities**

100.   Plaintiff incorporates paragraphs 1 to 99 by reference as if fully set forth herein.

101.   Defendants purportedly acted under color of law pursuant to the City of San Bernardino Municipal Code and the City of San Bernardino Charter, Resolution Nos. No. 2021-63, 2018-65, 2016-73, 2011-91, 2011-80, and 2005-286, as well as other City Council Resolutions and the contracts based on those Resolutions.

102.   Plaintiff claims that it was deprived of its civil rights as a result of the official policy of the City of San Bernardino and the City of San Bernardino's Police Department.

103.   The City and the City's Police Department have a custom of favoring the 2021 City Towers by not enforcing the City's tow service agreement requirements against the 2021 City Towers in exchange for illegal payments (the pay-for-play scheme) while stringently enforcing the same requirements against Plaintiff who did not provide the City with such payments.

104.   The Individual Defendants intentionally and knowingly furthered the City's custom of cronyism and favoritism by ignoring Plaintiff's grievances and, upon information and belief, rewarding the 2021 City Towers with tow service agreements a part of the City's RFP F 21-16.

105.   This denial of equal protection, by means of enforcing disparate treatment requiring Pepé's to meet the requirements of the City's tow service agreements prior to being placed on the City's Tow Rotation, but not enforcing the same requirements against the 2021 City Towers after the City engaged in an open bidding process pursuant to RFP F 21-16, was the official policy of the City of San Bernardino, intentionally carried out and/or ratified by the Individual Defendants.

106.   The Individual Defendants' acts and ratification decisions were conscious and deliberate choices to follow courses of action from among various alternatives.  These acts and ratification decisions were made intentionally with the knowledge that enforcement of the City's tow service agreement requirements on Pepé's but not on the 2021 City Towers violated Pepé's right to equal protection under the law.  This is particularly true in light of Pepé's prior lawsuit against the City for violations of Pepé's equal protection rights.

107.   The City's policy and custom, through the Individual Defendants' conduct of favoring the 2021 City Towers and disfavoring Plaintiff was a substantial factor in causing Plaintiff's harm.

### **THIRD CLAIM FOR RELIEF**

### ***Monell* Liability – Failure to Train (42 U.S.C. § 1983)**

### **Against All Defendants in Their Official and Individual Capacities**

108.   Plaintiff incorporates paragraphs 1–107 by reference as if fully set forth herein.

109.    Defendants purportedly acted under color of law pursuant to the City of San Bernardino Municipal Code and the City of San Bernardino Charter, Resolution Nos. No. 2021-63, 2018-65, 2016-73, 2011-91, 2011-80, and 2005-286, as well as other City Council Resolutions and the contracts based on those Resolutions.

110.   The City's training program was not adequate to train its deputies to properly and equally carry out the terms of the City's Tow Rotation agreements in accordance with Plaintiff's constitutional rights.

111.   The City knew, based on a pattern of similar occurrences, or it should have been obvious to it, that the inadequate training program was likely to result in a deprivation of Plaintiff's rights to equal protection.

112.   The Individual Defendants were responsible for setting the City's policies and corresponding training regarding the City's Tow Rotation.

113.  The Individual Defendants who favored the 2021 City Towers violated Plaintiff's rights to equal protection as a result of this inadequate training.

114.   The failure to provide adequate training was the cause of the deprivation of Plaintiff's rights to equal protection.

///
///
///
///
///
///

# FOURTH CLAIM FOR RELIEF

## Conspiracy (42 U.S.C. § 1985(3))

### Against All Defendants

115.   Plaintiff incorporates paragraphs 1- 114 by reference as if fully set forth herein.

116.   Defendants purportedly acted under color of law pursuant to the City of San Bernardino Municipal Code and the City of San Bernardino Charter, Resolution Nos. No. 2021-63, 2018-65, 2016-73, 2011-91, 2011-80, and 2005-286, as well as other City Council Resolutions and the contracts based on those Resolutions.

117.   The Individual Defendants, acting individually and in their official capacities, intentionally conspired to deprive Plaintiff of its statutory and constitutional rights as alleged herein.  Each Individual Defendant either knew of the other Individual Defendants' plan to deprive Plaintiff of its statutory or constitutional rights as alleged herein, agreed to participate in that conspiracy, or shared in the common objective of that conspiracy. The rights that Defendants conspired to deny through their wrongful acts are the right to equal protection under the law.  Plaintiff alleges the cause of action of the violation of the right to equal protection in its first claim.

118.   Defendants' acts were in furtherance of the conspiracy, and Defendants' invidiously discriminatory animus was behind Defendants' actions.

119.   The individual Defendants who carried out this conspiracy include Defendants Mayor John Valdivia, the City Council Members, including Defendants Theodore Sanchez, Sandra Ibarra, Juan Figueroa, Fred Shorett, Ben Reynoso, Kimberly Calvin, and Damon Alexander, City Manager Robert Field, City Attorney Sonia Carvalho, and Police Chief Eric McBride,  all of whom have failed to take action against the 2021 City Towers who are not in compliance with the City's tow requirements.

///

120.   The conspiracy was aimed at interfering with Plaintiff's protected rights such as the right to equal protection, free speech, and the right to petition.

121.   Defendants' actions violated clearly established statutory or constitutional rights of which a reasonable person would have known.

122.   As a result of Defendants' actions, Plaintiff suffered monetary damages, loss of business, loss of employment, and additional damage according to proof. Specifically, the inclusion of unqualified 2021 City Towers on the Tow Rotation has decreased the number of tows Plaintiff has received from the City.  Defendants' actions were motivated by evil motive or intent, and/or involved the reckless or callous indifference to Plaintiff's federally protected rights.

## FIFTH CLAIM FOR RELIEF

### *Monell* Liability – Ratification (42 U.S.C. § 1983)

### Against All Defendants in Their Official and Individual Capacities

123.   Plaintiff incorporates paragraphs 1–122 by reference.

124.   Defendants purportedly acted under color of law pursuant to the City of San Bernardino Municipal Code and the City of San Bernardino Charter, Resolution Nos. No. 2021-63, 2018-65, 2016-73, 2011-91, 2011-80, and 2005-286, as well as other City Council Resolutions and the contracts based on those Resolutions.

125.   Pepé's rights of equal protection were violated when, upon information and belief, the City granted tow services agreements to the 2021 City Towers even though they did not meet the City's established requirements.  Pepé's rights of equal protection were further violated when the City placed noncompliant 2021 City Towers on the City's Tow Rotation and failed to enforce the terms of the City's tow services agreements.

126.   Upon information and belief, Defendants Mayor John Valdivia, and the City Council Members, Theodore Sanchez, Sandra Ibarra, Juan Figueroa, Fred Shorett, Ben Reynoso, Kimberly Calvin, and Damon Alexander, City Manager Robert Field, City Attorney Sonia Carvalho, and Police Chief Eric McBride,

1 | ratified the decision that lead to the deprivation of Pepé's civil rights.

2 |     127.   Upon information and belief, the decisions by Defendants Mayor John

3 | Valdivia, and the City Council Members, Theodore Sanchez, Sandra Ibarra, Juan

4 | Figueroa, Fred Shorett, Ben Reynoso, Kimberly Calvin, and Damon Alexander, City

5 | Manager Robert Field, City Attorney Sonia Carvalho, and Police Chief Eric

6 | McBride, ratified the decision not to take action against the noncompliant 2021 City

7 | Towers were conscious and deliberate choices to follow courses of action from

8 | among various alternatives.

9 |     128.   As a result, Pepé's was deprived of constitutional rights and was

10 | harmed.

11 | **SIXTH CLAIM FOR RELIEF**

12 | **Neglect to Prevent (42 U.S.C. § 1986)**

13 | **Against All Individual Defendants**

14 |     129.   Plaintiff incorporates paragraphs 1–128 by reference.

15 |     130.   Defendants purportedly acted under color of law pursuant to the City of

16 | San Bernardino Municipal Code and the City of San Bernardino Charter, Resolution

17 | Nos. No. 2021-63, 2018-65, 2016-73, 2011-91, 2011-80, and 2005-286, as well as

18 | other City Council Resolutions and the contracts based on those Resolutions.

19 |     131.   Defendants, by being presented with information by Plaintiff, hearing

20 | or participating in meetings with other Defendants, and being privy to other

21 | information about Defendants' actions and contemplated actions involving Plaintiff,

22 | had knowledge that some or all of the wrongs conspired to be done were about to be

23 | committed, and had the power to prevent or aid in preventing the commission of

24 | those acts, but neglected, or refused to do so.

25 |     132.   The individuals who engaged in this wrongful conduct were

26 | Defendants Mayor John Valdivia, and the City Council Members, Theodore

27 | Sanchez, Sandra Ibarra, Juan Figueroa, Fred Shorett, Ben Reynoso, Kiberly Calvin,

28 | and Damon Alexander, City Manager Robert Field, City Attorney Sonia Carvalho,

and Police Chief Eric McBride.  These Defendants acted individually and in their official capacities.

133.  Defendants' actions violated clearly established statutory or constitutional rights of which a reasonable person would have known, as alleged herein.

134.  As a result of Defendants' actions and failure to act despite having the power to do so, Plaintiff suffered monetary damages, loss of business, loss of employment, and additional damage according to proof.

135.  Defendants' actions were motivated by evil motive or intent, and/or involved the reckless or callous indifference to Plaintiff's federally protected rights.

### SEVENTH CLAIM FOR RELIEF
### Breach of California Government Code § 1090
### Against Defendants John Valdivia, Theodore Sanchez, Sandra Ibarra Juan Figueroa, and Fred Shorett

136.  Plaintiff incorporates paragraphs 1–135 by reference.

137.  Code of Civil Procedure § 526a permits a taxpaying corporation to sue to obtain a judgment to restrain and prevent illegal or wasteful local government expenditures.  Under § 526a, a taxpaying corporation can sue to enforce violations of California Government Code § 1090, which prohibits local government officials from having a financial interest in any contract made by them in their official capacity.

138.  Plaintiff is a corporation that does business in the City and has paid taxes to the City.

139.  Defendant John Valdivia was at all relevant times the elected Mayor of the City. Likewise, Defendants Sanchez, Ibarra, Figueroa, and Shorett were at all relevant times elected Council Members of the City.

140.  At all relevant times, Defendants Valdivia, Sanchez, Ibarra, Figueroa, Shorett acted in their official capacities.

141.  Defendants Valdivia, Sanchez, Ibarra, Figueroa, and Shorett  each received campaign contributions and other nonmonetary benefits in the form of bribes from Armada Towing, Danny's Towing, Hayes Towing, Tri City Towing, and Wilson Towing in order to persuade the City officials to create tow service agreements with the 2021 City Towers, despite those Tow companies failing to comply with the City's requirements.

142.  As a result of pseudo campaign contributions, Defendants Valdivia, Sanchez, Ibarra, Figueroa, and Shorett had an indirect financial interest in approving tow service agreements with the City Towers.

143. Defendants Valdivia, Sanchez, Ibarra, Figueroa, and Shorett knowingly and willfully made or caused to be made express contracts between the City and the 2021 City Towers in spite of the fact that they knew they had a prohibited financial interest in such contracts.

144. By virtue of the foregoing, Defendants Valdivia, Sanchez, Ibarra, Figueroa, and have violated Government Code § 1090.

145.  As a result, Defendants Valdivia, Sanchez, Ibarra, Figueroa, and Shorett are required to pay back to the City all amounts paid by the City to Armada Towing, Danny's Towing, Hayes Towing, Tri City Towing, and Wilson Towing.

146. Furthermore, because Defendants Valdivia, Sanchez, Ibarra, Figueroa, and Shorett violated Government Code § 1090, the tow service agreements between the City and Armada Towing, Danny's Towing, Hayes Towing, Tri City Towing, and Wilson Towing are void as a matter of law.

### **EIGHTH CLAIM FOR RELIEF**

### **Declaratory**

### **Against Defendants John Valdivia, Theodore Sanchez, Sandra Ibarra Juan**

### **Figueroa, and Fred Shorett**

147. Plaintiff incorporates paragraphs 1–146 by reference.

148.  A present and actual controversy exists between Plaintiff and

1   Defendants Valdivia, Sanchez, Ibarra, Figueroa, and Shorett,  regarding the

2   Individual Defendants' duties and obligations to pay back all monies paid by the

3   City to the 2021 City Towers for the 2021 RFP. In particular, Plaintiff contends that

4   the tow service agreements are null and void, invalid and unenforceable due to

5   violations of Government Code § 1090, et seq. Plaintiffs are informed and believe

6   that Defendants dispute these contentions.

7          149.  Plaintiff desires a judicial determination and declaration of the

8   Individual Defendants' obligations and duties under Government Code § 1090 with

9   respect to the monies paid by the City to the 2021 City Towers during the 2021

10  RFP. Specifically, Plaintiff desires a determination that the tow service agreements

11  between the City and the 2021 City Towards are not valid or enforceable due to

12  violation of Section 1090, et seq.

13                        **PRAYER FOR RELIEF**

14          WHEREFORE, Plaintiff Pepé's Towing ("Plaintiff") prays for relief and

15  judgment against Defendant the City of San Bernardino as follows:

16          1.      For general and special damages according to proof;

17          2.      For the tow services agreements between the City and the 2021 City

18  Towers (i.e., Armada Towing, Danny's Towing, Haye's Towing, Tri City Towing,

19  and Wilson Towing) declared null and void.

20          3.      For civil penalties pursuant to Government Code § 1097 including a

21  fine of $1,000, imprisonment in the state prison, and disqualification from ever

22  holding any office in the state to be enforced against Defendants Valdivia, Sanchez,

23  Ibarra, Figueroa, and Shorett.

24          4.      For  Defendants Valdivia, Sanchez, Ibarra, Figueroa, and Shorett, to

25  pay back to the City all payments made to the 2021 City Towers as a result of

26  violation § 1090.

27          5.      For punitive damages against the City and the Individual Defendants in

28  their personal capacities;

1   6. For an award of attorneys' fees under 42 U.S.C. § 1998, 18 U.S.C. §

2 1964(c), Cal. Code of Civil Procedure § 1021.5, and/or any other applicable

3 provision of law;

4   7. Costs, interest, and such other and further appropriate relief that the

5 Court deems just and proper.

6   8. Costs, interest, and such other and further appropriate relief that the

7 Court deems just and proper.

8

9 Dated:  September 29, 2021   LARSON LLP

10

11

12      By: /s/ Stephen G. Larson

13        Stephen G. Larson
        R. C. Harlan

14        Troy S. Tessem

15      Attorneys for Plaintiff
      PEPÉ'S, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

LARSON LLP
LOS ANGELES

COMPLAINT AND DEMAND FOR JURY TRIAL

1

## **<u>DEMAND FOR JURY TRIAL</u>**

2          In accordance with Local Rule 38-1, Plaintiff Pepé's, Inc. demands a trial by

3   jury on all claims for which a jury trial is provided under law.

4

5   Dated:  September 29, 2021          LARSON LLP

6

7

8                                                      By:   /s/ Stephen G. Larson
                                                              Stephen G. Larson
9                                                             R. C. Harlan
                                                              Troy S. Tessem
10                                                     Attorneys for Plaintiff
                                                       PEPÉ'S, INC.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28